ERICK M. FERRAN, ESQ.
Nevada State Bar No. 9554
HITZKE & FERRAN LLP.
2110 East Flamingo Road, Suite 206
Las Vegas, Nevada 89119
*Telephone No.: (702) 476-9668*
*Facsimile No.: (702) 462-2646*
*erick.ferran@hitzkelaw.com*
*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO.: 2:24-cr-00229-APG-NJK** |
| Plaintiff, | **DEFENDANTS EMERGENCY MOTION TO REOPEN DETENTION PROCEEDINGS PURSUANT TO 18 U.S.C. § 3142(f) and Fed. R. Crim. P. 46** |
| vs. | |
| TIMOTHY NEAL THURTLE, | |
| Defendant. | |

COMES NOW the Defendant, TIMOTHY NEAL THURTLE, by and through Erick M. Ferran, Esq., from the law office of Hitzke & Ferran LLP., and respectfully moves this Honorable Court to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f) and Federal Rule of Criminal Procedure 46. This Motion is based on the grounds that new information exists materially bearing on the Defendant's health and medical care while in custody.

Specifically, the Defendant's serious and ongoing medical conditions require immediate access to adequate treatment and prescription medications, which are not being adequately provided in detention.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

- 1 -

1    This Motion is made and based upon all the papers and pleadings on file herein, the

2    attached Declaration of Counsel, the Memorandum of Points and Authorities, and any additional

3    oral argument taken at the time set hearing this Motion.

4        DATED this 23RD day of September 2025.

5                                          HITZKE & FERRAN LLP.

6                                          /s/ Erick M. Ferran, Esq.
7                                          2110 East Flamingo Road, Suite 206
                                           Las Vegas, Nevada 89119
8                                          *Telephone No.: (702) 476-9668*
                                           *Facsimile No.: (702) 462-2646*
9                                          *erick.ferran@hitzkelaw.com*
                                           *Attorneys for Defendant*
10

11    **I.   MEMORANDUM OF POINTS AND AUTHORITIES**

12        Defendant Thurtle moves this Honorable Court, pursuant to statute, to reopen the detention

13    hearing because new and material information—unavailable at the initial hearing—directly

14    impacts whether conditions of release can reasonably assure his appearance and community

15    safety.[1] The Bail Reform Act requires release on the least restrictive conditions unless the

16    government proves that no condition or combination of conditions will suffice.[2]

17        Here, material facts not presented at the original hearing now warrant reconsideration.

18    First, the detention facility, which previously accepted hand-delivered medications from

19    Mr. Thurtle's wife, has recently refused receiving his prescribed medications, asserting they are

20    "not necessary." *See* **Exhibit A.** Neither defense counsel nor the Court had access to updated

21    medical records or treating physician recommendations at the initial hearing. Second, immediate

22    medical examinations would likely confirm deficiencies in treatment. This evidence directly

23    implicates statute, which requires courts to consider a defendant's "physical and mental condition"

24    in the detention analysis.[3]

25    _____

26    [1] 18 U.S.C. § 3142(f)(2)(B)
      [2] See 18 U.S.C. § 3142(b), (c), (e)(1); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)
27    (emphasizing that "[o]nly in rare circumstances should release be denied" and that "doubts regarding the
      propriety of release should be resolved in the defendant's favor").
28    [3] § 3142(g)(3)

                                          - 2 -

1    Thurtle's physician, Dr. George S. Tu, M.D., advises that Thurtle suffers from pulmonary
2   arterial hypertension, which is a life-threatening condition. Dr. Tu confirms that Thurtle has been
3   prescribed Tyvaso DPI inhaler, which is required four times daily, and cautions that when a patient
4   suddenly discontinues treatments for PAH, they will likely experience a sudden rebound effect,
5   which includes severe chest pain, shortness of breath, and is a high risk for death.
6   *See* **Exhibit B.**

7    The Ninth Circuit has consistently held that courts must evaluate all relevant statutory
8   factors and impose the least restrictive conditions necessary to assure appearance and safety.[4]
9   When new evidence materially alters that analysis, statute authorizes reopening.[5] [6] Serious medical
10  needs fall squarely within this framework, particularly when alternative conditions—such as home
11  confinement and electronic monitoring—could address appearance and safety concerns while
12  ensuring proper care.

13   Because the newly presented medical information fundamentally changes the detention
14  calculus, the Court should grant this motion, reopen the detention hearing, and consider whether
15  appropriate release conditions can satisfy statutory requirements under § 3142.

16  **II.  LEGAL STANDARD**

17  **A.  Statutory Basis for Reopening the Detention Hearing**

18   Statute provides that a detention hearing may be reopened "if the judicial officer finds that
19  information exists that was not known to the movant at the time of the hearing and that has a
20  material bearing on the issue" of whether release conditions can ensure the defendant's appearance
21  and the safety of the community.[7]

22   Here, the new information pertains to the Thurtle's serious medical needs and the inability
23  of the detention facility to provide adequate care. At the time of the original hearing, the facility
24  in which Thurtle is housed, was regularly accepting hand delivery of Thurtle's medications,

25  _____

26  [4] *Motamedi*, 767 F.2d at 1405-06; *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015).
    [5] § 3142(f)
27  [6] See *United States v. McCandless*, 841 F.3d 819, 822 (9th Cir. 2016) (reopening appropriate where new
    information has a material bearing on detention factors).
28  [7] 18 U.S.C. § 3142(f)(2)(B)

1  delivered by his wife. However, as of recently, the facility has declined Thurtle's medications,

2  citing that medical staff at the facility have made the determination that his prescribed medications

3  are "not necessary", contradicting Thurtle's pulmonologist who advises that suddenly

4  discontinuing treatments for Thurtle's diagnosis increases risk of death. Further, at the initial

5  hearing, neither the undersigned or the Court had the benefit of the current medical records and

6  physician recommendations.

7      Additionally, should this Court find merit in Thurtle's Motion, immediate medical

8  examinations would undoubtedly demonstrate deficiencies in treatment. This evidence directly

9  impacts whether the Defendant's continued detention is compatible with statutory requirements,

10  particularly when alternative conditions such as home confinement and electronic monitoring

11  exist, which would address concerns for appearance and public safety.

12      Federal courts have repeatedly acknowledged that serious medical conditions can justify

13  reopening detention.[8] Thus, § 3142(f) explicitly authorizes reopening where, as here, the

14  defendant's health status materially alters the detention analysis.

15      **B. Constitutional Due Process and Adequate Medical Care**

16      The Due Process Clauses of the Fifth and Fourteenth Amendments protect pretrial

17  detainees from punitive conditions of confinement before any adjudication of guilt.[9] The Supreme

18  Court has made clear that individuals awaiting trial retain constitutional protections, including the

19  right to adequate medical care and the right to be free from conditions that amount to punishment.[10]

20      The Ninth Circuit has consistently held that pretrial detainees cannot be subjected to

21  conditions or treatment amounting to punishment and that the government bears an affirmative

22  obligation to provide timely and adequate medical care.[11] Where officials fail to provide necessary

23  _____

24  [8] *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993): Court granted release when a defendant with terminal illness could not receive adequate care in custody. *United States v. Adams*, 2008 WL 3414012

25  (D. Kan. Aug. 8, 2008): New medical evidence justified reconsideration of detention order. *United States v. Wages*, 271 Fed. Appx. 726 (10th Cir. 2008): Courts may consider a defendant's health in

26  fashioning appropriate release conditions.
   [9] See *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979).

27  [10] *Id.* at 535 n.16; *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

28  [11] See *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (applying objective deliberate indifference standard for pretrial detainees' medical claims); *Jones v. Blanas*, 393 F.3d 918, 931–32

1  medical treatment—through indifference, refusal, or lack of resources—continued detention under

2  such circumstances may become unconstitutional.[12]

3       Detention serves only regulatory purposes—ensuring appearance at trial and protecting the

4  community—not punitive ones.[13] When serious medical needs go unmet, detention risks crossing

5  the constitutional line into punishment, triggering judicial intervention. In such circumstances,

6  courts have recognized that release under appropriate conditions may be the only remedy

7  consistent with due process.[14]

8  **C. Balancing Public Safety, Flight Risk, and Medical Necessity**

9       While § 3142(g) requires courts to consider flight risk and danger to the community, these

10 concerns can be addressed through stringent release conditions such as (1) home confinement with

11 electronic monitoring; (2) third-party custodianship; (3) regular court appearances; (4) restrictions

12 on travel, firearms, or contact with certain individuals.

13      Case law demonstrates that Courts have the ability to release a defendant due to "serious

14 health conditions and the availability of restrictive conditions ensuring appearance and safety."[15]

15 Here, similarly tailored conditions can balance the government's interests with the Defendant's

16 fundamental right to life-sustaining medical care.

17 **D. COVID-19 and Broader Health Concerns Strengthening Precedent**

18      Courts across the country, particularly during the COVID-19 pandemic, routinely

19 recognized that detention facilities can pose heightened risks to individuals with significant

20 medical vulnerabilities.[16] When continued incarceration threatened detainees' health due to

21 inadequate medical care or the inability to protect against serious illness, courts did not hesitate to

22 order release or reconsider prior detention decisions.

---

(9th Cir. 2004) (holding conditions that are "excessively harsh" relative to the purpose of detention may constitute impermissible punishment).

[12] *Gordon*, 888 F.3d at 1124–25; *Castro v. County of Los Angeles*, 833 F.3d 1060, 1068–71 (9th Cir. 2016) (*en banc*).

[13] See *Bell*, 441 U.S. at 539; *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).

[14] *Jones*, 393 F.3d at 932; Demery, 378 F.3d at 1030.

[15] *United States v. McDuffie*, 451 F. Supp. 4d 281 (D.D.C. 2020)

[16] See *United States v. Stephens*, 447 F. Supp. 3d 63 (S.D.N.Y. 2020) (granting release for high-risk defendant due to COVID-19 health concerns).

Although the present motion does not rest solely on pandemic-related circumstances, these cases remain instructive. They underscore a broader principle: when serious health risks exist—and especially where detention facilities have demonstrated difficulty in providing appropriate medical treatment—courts have both the authority and the responsibility to reevaluate detention decisions.

Moreover, these decisions consistently emphasized that the Bail Reform Act permits release when less restrictive alternatives, such as conditions of home confinement, electronic monitoring, or other tailored measures, can reasonably assure both appearance and community safety. This body of precedent makes clear that when health and safety are at stake, courts should not maintain detention where viable alternatives exist to mitigate risk while fulfilling the purposes of § 3142.

## III. ARGUMENT

### A. Statutory Authority to Reopen the Detention Hearing under 18 U.S.C. § 3142(f)

Federal law expressly authorizes reopening a detention hearing when new, material information arises.

18 U.S.C. § 3142(f)(2)(B) provides in pertinent part:

> "The hearing may be reopened if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."

Thurtle now presents new evidence regarding his serious medical conditions, the inadequacy of treatment in detention, the refusal by facility staff to accept the prescribed medications, and the risks posed by continued incarceration. This information was not available or fully understood at the time of the initial detention hearing and materially alters the analysis under § 3142(g).

Until recently, the facility had been routinely accepting the prescription medications which were being hand delivered to the Warden, however during the most recent attempt at delivery, the medications were refused. Courts have routinely granted motions to reopen when health concerns

1 warrant reconsideration.[17] This authority makes clear that when medical care is inadequate in
2 custody, reopening the hearing is both proper and necessary.

3 **B. Constitutional Mandates for Adequate Medical Care**

4 The Supreme Court has long held that when the government detains individuals, it assumes
5 an affirmative constitutional obligation to provide for their basic needs, including adequate
6 medical care. The Court has established that "deliberate indifference to serious medical needs of
7 prisoners" constitutes cruel and unusual punishment in violation of the Eighth Amendment.[18]
8 Although *Estelle* concerned convicted prisoners, its reasoning has been extended to pretrial
9 detainees through the Due Process Clause of the Fourteenth Amendment, as the state holds similar
10 responsibilities once it deprives a person of liberty.

11 Subsequent decisions reinforced and expanded this principle. Additionally, the Court made
12 clear that even before conviction, when individuals are injured while in police custody, the
13 government bears the cost and responsibility for providing necessary medical treatment.[19] The
14 Court has also recognized in cases that systemic failures to provide adequate care—such as those
15 caused by overcrowding or underfunding—can rise to the level of constitutional violations
16 warranting structural remedies, including population reductions or releases.[20]

17 The logic is straightforward: once the government restrains a person's liberty, it removes
18 their ability to care for themselves. It therefore cannot expose them to serious medical risks without
19 providing constitutionally adequate care. When the government is unwilling or unable to meet this
20 obligation within the detention setting, continued confinement becomes unconstitutional.

21 In such cases, conditional release becomes the only lawful remedy. The Constitution does
22 not permit the government to deprive someone of liberty while simultaneously denying the care

---

[17] *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993): Pretrial release was granted where the Bureau of Prisons could not provide adequate medical care to a terminally ill defendant. *United States v. Wages*, 271 Fed. Appx. 726 (10th Cir. 2008): Court emphasized the need to consider serious health issues when deciding detention. *United States v. Adams*, 2008 WL 3414012 (D. Kan. Aug. 8, 2008): Reopening was warranted when new medical evidence arose after the original detention decision.
[18] *Estelle v. Gamble*, 429 U.S. 97 (1976)
[19] *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239 (1983)
[20] *Brown v. Plata*, 563 U.S. 493 (2011)

– 7 –

1  necessary to preserve life and health. Courts confronted with this situation have consistently

2  recognized that if adequate medical care cannot be delivered in custody, release—subject to

3  conditions ensuring access to treatment—becomes not a matter of discretion but of constitutional

4  necessity.

5      **C.  The Bail Reform Act's Balancing Test under 18 U.S.C. § 3142(g)**

6          Section 3142(g) directs courts to consider four factors: (1) nature and circumstances of the

7  offense charged; (2) weight of the evidence against the person; (3) history and characteristics of

8  the person, including physical and mental condition; and (4) nature and seriousness of the danger

9  to any person or the community.

10          Thurtle's medical needs fall squarely under the "history and characteristics" factor. Courts

11  have recognized that serious health conditions reduce flight risk and danger because defendants

12  with significant medical needs are less likely to abscond or reoffend when released on strict

13  conditions.[21] Moreover, modern release tools—such as home confinement, electronic monitoring,

14  travel restrictions, and third-party custodians—can adequately protect the community while

15  ensuring Thurtle's access to lifesaving care.

16      **D.  Public Health Emergencies Reinforce the Need for Medical Considerations**

17          While these principles are not restricted to COVID-19, pandemic-era rulings in the

18  Ninth Circuit illustrate that serious health risks in detention can—and do—tip the balance in favor

19  of release or modified custody. The Ninth Circuit has held that Immigration and Customs

20  Enforcement must identify detainees at elevated medical risk for severe COVID-19 outcomes and

21  release them if safe medical care cannot be provided.[22] Further, in Adelanto Detention Facility

22  litigation, the court approved class wide injunctive relief upon finding that alleged due process

23

24

25

26

---

27  [21] See *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (release granted to permit treatment after severe injury).

28  [22] *Fraihat v. U.S. Immigration & Customs Enf't*, 984 F.3d 859, 868-70 (9th Cir. 2021) (*en banc*) (requiring individualized determinations where "medically necessary safeguards cannot be immediately provided").

violations (including the inability to safely treat detainees during COVID-19) exposed all detainees to "an unnecessary risk of harm."[23]

These decisions reinforce that where a facility either cannot or will not meet serious medical needs during a public health crisis, continued detention may become unconstitutional. Such risk is not merely speculative—when medical vulnerabilities are known, authorities must either provide adequate treatment or consider release under appropriate conditions.[24]

Thus, in your case, the similar showing of serious medical need and failure to deliver prescribed care parallels those Ninth Circuit precedents. Under that authority, health risks of this magnitude (when medical facilities decline necessary treatment) provide compelling grounds for reopening detention or modifying custody conditions.

**E.  The Court's Equitable Authority and Conditions of Release**

Finally, federal courts retain equitable authority to craft narrowly tailored release conditions under § 3142(c) to mitigate risks while addressing constitutional and humanitarian concerns. Courts have imposed (1) home detention with electronic monitoring; (2) mandatory medical treatment orders; (3) third-party custodians such as family members or medical providers; and (4) travel and firearm prohibitions.

This ensures the Defendant receives necessary medical care without undermining public safety or flight risk concerns.

**CONCLUSION**

For all the reasons set forth above, Thurtle respectfully submits that reopening the detention hearing is both legally justified and constitutionally required. Statute provides that newly discovered and material information regarding Thurtle's serious medical conditions, the insufficiency of care in detention, and the resulting health risks warrant reconsideration of the original detention order.[25]

---

[23] Adelanto Detention Facility Cases, No. 20-cv-00617-TJH-KS, Order certifying class; see also findings summarized in *Fraihat*.
[24] *Fraihat*, 984 F.3d at 868-70; Adelanto, slip op. at — (certification order, noting systemic failure of care)
[25] 18 U.S.C. § 3142(f)

1      The Bail Reform Act and the Constitution mandate that pretrial detention must not deprive

2  individuals of necessary medical treatment or subject them to conditions that amount to

3  punishment before conviction. The Supreme Court has made clear that detainees retain

4  fundamental rights to life, health, and due process, and courts have repeatedly recognized that

5  serious medical needs outweigh continued detention when appropriate release conditions can

6  mitigate risks to public safety and assure the defendant's appearance in court.

7      Moreover, the Court has broad discretion provided by statute to impose stringent

8  conditions—such as home confinement, electronic monitoring, third-party custodianship, and

9  travel restrictions—that will protect the community while ensuring Thurtle receives adequate

10  medical care.[26]

11      Given the compelling constitutional concerns, statutory authority, and equitable

12  considerations presented herein, Thurtle respectfully requests that this Honorable Court (1) reopen

13  the detention hearing pursuant to 18 U.S.C. § 3142(f); (2) consider the newly presented evidence

14  concerning the Defendant's medical needs and the facility's inability to provide constitutionally

15  adequate care; (3) order Thurtle's release on strict conditions; and (4) grant any further relief the

16  Court deems just and proper in light of the Defendant's constitutional rights and the interests of

17  justice.

18      DATED this 23RD day of September 2025.

19                                    **HITZKE & FERRAN LLP.**

20

21                                 /s/ Erick M. Ferran, Esq.

22                                 2110 East Flamingo Road, Suite 206
                                   Las Vegas, Nevada 89119

23                                 *Telephone No.: (702) 476-9668*
                                   *Facsimile No.: (702) 462-2646*

24                                 *erick.ferran@hitzkelaw.com*
                                 *Attorneys for Defendant*

25

26

27  ————————————————

28  [26] 18 U.S.C. § 3142(c)

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that I am an attorney of counsel with HITZKE & FERRAN LLP., and that

3 on this 23RD day of September 2025., I did cause a true and correct copy of:

4 **DEFENDANTS EMERGENCY MOTION TO REOPEN DETENTION PROCEEDINGS**

5      **PURSUANT TO 18 U.S.C. § 3142(f) and Fed. R. Crim. P. 46**

6 to be served via electronic service by the U.S. District Court CM/ECF system to the parties on the

7 Electronic Filing system in this action, including:

8 Lauren Ibanez, Esq.
Assistant United States Attorney
9 United States Attorney's Office
501 South Las Vegas Boulevard
10 Las Vegas, Nevada 89101
Lauren.Ibanez@usdoj.gov
11

12 Robert Knief, Esq.
Assistant United States Attorney
13 United States Attorney's Office
501 South Las Vegas Boulevard
14 Las Vegas, Nevada 89101
Robert.Knief@usdoj.gov
15

16

17
                                        /s/ Erick M. Ferran, Esq.
18                                      *An employee of Hitzke & Ferran LLP.*

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**DECLARATION OF DENISE THURTLE IN SUPPORT OF DEFENDANT'S**
**EMERGENCY MOTION TO REOPEN DETENTION PROCEEDINGS PURSUANT TO**
**18 U.S.C. § 3142(f) and Fed. R. Crim. P. 46**

STATE OF NEVADA        )
                       ) ss.
COUNTY OF CLARK        )

I, Denise Thurtle, hereby declare as follows:

I am over the age of 18 years old and am the wife of Timothy Thurtle, who is currently detained at the Nevada Southern Detention Center (NSDC).

I have personal knowledge of the facts stated herein and could testify competently to them if called as a witness.

My husband suffers from Pulmonary Arterial Hypertension (PAH). His treating Pulmonologist, Dr. George Tu, has prescribed him Tyvaso DPI, a medication that helps dilate pulmonary arteries, improve exercise ability, reduce strain on the heart, and enhance quality of life for patients with PAH.

When Timothy was transferred from Core Civic, Otay Mesa Detention Center, he brought his Tyvaso DPI medication with him, and the facility allowed me to deliver additional prescription medication as needed.

When Timothy was transferred to NSDC, I attempted to deliver his prescribed medication but the initial attempts to do so were refused. After filing a complaint with Core Civic's Ethics Line and contacting the U.S. Marshals Office, Supervisor Ostryan intervened, and I was granted authorization to bring unopened packages of Tyvaso DPI directly to NSDC.

Tyvaso DPI costs approximately $28,000 per month and can only be prescribed by a specialist familiar with PAH. It cannot be ordered from a regular pharmacy but only through a Specialty Pharmacy.

On September 8, 2025, Timothy submitted a written request (kite) to Chief Thorton and Ms. Pierce at NSDC for me to deliver his Tyvaso DPI on September 10, 2025. He received written approval for this delivery.

- 1 -

1   However, on September 10, 2025, when I arrived at the facility at approximately

2   12:30 PM, the Warden, John Mattos, refused to accept the medication and denied my request to

3   deliver it despite prior written approval and my attempts to explain the authorization process

4   through the U.S. Marshals Office.

5   After being refused, I immediately filed another complaint with Core Civic's Ethics Line.

6   As of September 13, 2025, I have not received any updates or assistance from the facility or Core

7   Civic regarding this matter.

8   Tyvaso DPI is critical for Timothy's survival and health. Denying access to this prescribed

9   medication places his life at serious risk.

10   I make this declaration to support Timothy's motion for appropriate medical treatment and

11   immediate relief, including the continuation of his prescribed Tyvaso DPI therapy without

12   interference or denial by NSDC officials.

13

14   I declare under penalty of perjury under the laws of the United States of America, pursuant

15   to 28 U.S.C. § 1746, that the foregoing is true and correct.

16   Executed this 22 day of September, 2025, at Las Vegas NV

17

18   _Denise Thurtle_

19   Denise Thurtle
     Wife of Timothy Thurtle

20

21

22   Notary Public

23

24   My commission expires: July 5, 2028

25

26

27

28

State of Nevada, County of Clark }} ss.

Signed and sworn to (or affirmed) before me

on this 22 day of September, 2025,

by Denise Thurtle

SETH COSE
Notary Public, State of Nevada
No. 16-2967-1
My Appt. Exp. July 5, 2028

- 2 -

# EXHIBIT B

**Lung Center of Nevada**
A Division of Comprehensive Cancer Centers of Nevada

653 N Town Center Dr, Suite 604
Las Vegas, NV 89144-0514
Phone: (702) 737-5864
Fax: (702) 463-7015

09/17/2025

To Whom It May Concern:

TIMOTHY N. THURTLE is a patient at the LUNG CENTER OF NEVADA.

Patient is under my are for a pulmonary arterial hypertension (PAH) which is a life-threatening condition. Without any treatments, median survival is approximately 2 years. Symptoms of PAH include shortness of breath, chest pain, dizziness, and fatigue.

Patient has been on Tyvaso DPI inhaler 64 mcg four times daily. This specific medication has offered improvment in his overall symptom control, daily function, and quality of life. The half-life of this medication is approximately 27-50 mintues. When a patient suddenly discontinue treatments for PAH, he/she will likely experience a sudden rebound effect of PAH with severe chest pain, shortness of breath, and is a high risk for death.

If you have further questions regarding this patient's health status, please contact us at

(702) 737-5864.

George S. Tu MD

TIMOTHY N. THURTLE                    Patient #: ▓▓▓▓              DOB: ▓▓▓▓ (64 years)
Wednesday, September 17, 2025                                                          Page 1 / 1

653 N Town Center Dr, Suite 604
Las Vegas, NV 89144-0514
Phone: (702) 737-5864
Fax: (702) 463-7015

## Lung Center of Nevada
A Division of Comprehensive Cancer Centers of Nevada

**Patient: TIMOTHY N. THURTLE**          **Date of Service:** 02/14/2025                    **DOB:**

History of Present Illness
Patient words: Follow up.

The patient is a 64 year old male.

Allergies
**Medrol \*CORTICOSTEROIDS\* [Drug allergy]:** Dermatitis, Rash
**Thorazine \*ANTIPSYCHOTICS/ANTIMANIC AGENTS\* []**
**Prevacid \*ULCER DRUGS\* []**
**Antibiotic \*DERMATOLOGICALS\* []**
**Albuterol \*ANTIASTHMATIC AND BRONCHODILATOR AGENTS\* []**
**Allergies Reconciled**
Past Medical History
**DSORD, ORGANIC OBSTRUCTIVE SLEEP APNEA**
**SYMPTOM, SHORTNESS OF BREATH**
**SYMPTOM, PAIN, CHEST NEC**
**RHINITIS, ALLERGIC NOS**
**DISORDER, DEPRESSIVE NEC**
**HEPATITIS VIRAL C W/O HEPATIC COMA NOS**
**Thrush of mouth and esophagus (B37.81)**
**Fatigue (R53.83)**
**Acute otitis externa (H60.509)**
**Post-COVID-19 condition (U09.9)**
**Erythrocytosis (D75.1)**
**Bronchitis (J40)**
**Gastroesophageal reflux disease (K21.9)** ; has severe GERD now at night and is waking pt up with chest pain hasbeen on Tums
suggested adding zantac OTC 2 tabs nightly
GERD may be aggrevated by adcirca
**Obstructive sleep apnea (G47.33)** ; not able to tolerate CPAP
**Chronic respiratory failure with hypoxia (J96.11)** ; 10/26/2017 no major changes
12/12/18 continue O2 nigttly
12/10/19 Alternative therapies such as (albuterol) have been tried and proven in-effective in treating this patients hypoxemia, therefore I am ordering long term oxygen at 2 lpm for this chronic and stable respiratory failiure with hypoxemia and PAH
4/24/2020 Alternative therapies such as (albuterol) have been tried and proven in-effective in treating this patients hypoxemia, therefore I am ordering long term oxygen at 2pm for this chronic and stable respiratory failiure with hypoxemia and PAH . adherinf to O2 at night
6/4/2020 continue O2 nightyl as ordered has some pND
**Pulmonary hypertension, primary (I27.0)** ; WHO Group 1, NYHA functional class III symptoms. Clinically seems worse based on ADLs and RHC 3/10. But patient is reluctant to try additional treatment. He is reluctant for Flolan. Does not want ERAs due to need for blood draws. Could not tolerate Ventavis.
8/14/14 not tolerating Letairis due to severe nasal congestion eventhough he did feel better
NYHA Func Class III
subjectively much worse now with chest tightness and restrictive feeling.
10/30/2014 HD worse. NYFA Functional Class III. symptoms are worse
mPAP increased to 52
9/30/14 RHC PCWP 15, PAP 67/40 (mPAP 52), PVR 426, CO 6.9
**Chronic hepatitis C (B18.2)**
**Hypoxemia (R09.02)**
**Mild intermittent asthma without complication (J45.20)**
**Problems Reconciled**

<u>Family History</u>
**Respiratory Problems**; Family Members In General
**Arthritis**: Family Members In General
**Ulcer Disease**: Family Members In General
**Alcoholism**; Family Members In General.
**Hypertension**: Family Members In General
**Hemorrhoids**: Family Members In General
**Cataracts**; Family Members In General
**Glaucoma**; Family Members In General
**Lou Gehrig's Disease**; Family Members In General
**Gallbladder Disease**; Family Members In General.
**Liver Disease, Chronic**: Family Members In General
<u>Social History</u>
**Alcohol Use**: Exalcoholic and now drinks only small amounts socially.(Dictated 3/7/10)
**Pets/Animals**: Cat; 4 dogs and a bird.(Dictated 3/7/01)
**Drug Use**; Was a known intravenous drug abuser of heroin and cocaine who had been clean for many years and then relapsed about six months ago.(Dictated 3/7/02)
**Tobacco Use**; Smokes eight to ten cigars per day and has smoked tobacco products for 20 years.(Dictated 3/7/02)
**Sleep History**: Sleep Hours; 6
**Caffeine use**: Coffee, Tea, Carbonated beverages, 1 serving / day
**Current Work/Study Status**; Owns his own tattoo studio. In the remote past, he has done sales and contruction.(Dictated 3/7/01)
<u>Travel</u>
**None** (08/14/2014)
<u>Past Surgical</u>
**Right elbow**; 2010
**Skin Graph**; 1974
**Right wrist**; 2010
**Gall Bladder**; 2009
**Complete Tendon Repair**; 2010
<u>Diagnostic Studies</u>
**Colonoscopy** (02/14/2025): Refused
<u>Health Maintenance</u>
**Flu Vaccine** (02/14/2025): Refused; Never
**COVID Vaccine- Pfizer**; none
**PPD**; Negative:1999
**Pneumovax 23 (Pneumococcal vaccine Polyvalent)** (02/14/2025): Refused
<u>Medication History</u>
Spiriva Respimat (2.5mcg/actuat Mist, 2 (two) inhalation qHS, Taken starting 11/06/2024) Active. (Please call us if PA is required)
albuterol sulfate (90mcg/actuat HFA Aerosol Inh, 2 (two) inhalation q4 hours prn SOB, Taken starting 12/01/2023) Active.
Ventolin HFA (90mcg/actuat HFA Aerosol Inh, 2 (two) inhalation q4hours prn sob, Taken starting 09/27/2023) Active.
Orenitram (0.25mg tablet, extende 1 (one) oral two times daily, Taken starting 11/06/2024) Active - Hx Entry.
Tyvaso DPI (16mcg cartridge with 1 (one) inhalation QID, Taken starting 03/10/2024) Active - Hx Entry.
Medications Reconciled.

**Weight:** 201 lb **Height:** 71 in
**Body Surface Area:** 2.11 m² **Body Mass Index:** 28.03 kg/m²
**Temp.:** 97.9 ºF (Temporal) **Pulse:** 98 (Regular) **Resp.:** 20 (Unlabored) **P. OX:** 95% (Room air)
**BP:** 114/84 Manual (Sitting, Left Arm, Standard)
<u>Assessment & Plan</u>

**Pulmonary hypertension, primary (Principal Diagnosis) (I27.0)**
**Problem Story:** WHO Group I, NYHA functional class III symptoms. Clinically seems worse based on ADLs and RHC 3/10. But patient is reluctant to try additional treatment. He is reluctant for Flolan. Does not want ERAs due to need for blood draws. Could not tolerate Ventavis.
8/14/14 not tolerating Letairis due to severe nasal congestion eventhough he did feel better
NYHA Func Class III
subjectively much worse now with chest tightness and restrictive feeling.
10/30/2014 HD worse. NYFA Functional Class III. symptoms are worse

mPAP increased to 52
9/30/14 RHC PCWP 15, PAP 67/40 (mPAP 52), PVR 426, CO 6.9
**Today's' Impression:** 10/26/2017 on opsumit, adcircca, 2 green and 1 yellow orenitram. tired...working a lot. does not like the way orenitram makes him feel. he admanately does not want to take BID dosing. d/w pt regardign possibe Uptravi. also has priapism will need to strongly consider DC PDE5i. will need to consider riociguot as well
12/21/2017 needs echo. will consider swtlch PDE5i to riociguot. will reasess
2/9/2018 per Eccho RVSP 40-45 Grade I diastolic. overll ok. will contiue as is consider riociguot if needed
8/15/2018 Overall remained relatively stable. Last echocardiogram January RVSP only at 40. Continue to monitor. No changes with medication for now. Patient is able to do ADLs without difficulties.
12/12/2018 tadalafil does NOT work for pt must be on Branded Adcirca. However, patient symptom seems to be slightly worsening. Not as well-controlled as targeted goal. PDE 5 inhibitors may not be as effective we will switch patient to riociguot. Indication as well as treatment discussed with patient. Potential adverse effect also discussed the patient. Reassess in 4 weeks. Will eventually need echocardiogram.
1/31/19 tolerating adempas at BID dosing. will contineu to titrate every 2 wks as tolerates
4/5/19 Is tolerating treatment the subjective feels somewhat better although still remains tired. Will continue to wear with alternative titration dosage for the patient continue follow-up echocardiogram reassessing 6 to 8 weeks.
12/10/2019 on higher dose of remodulin and adempas continue tx as is
4/24/2020 take 2 in am and 1 oin afternoon will need echo ? need more meds
6/4/2020 needs to work on titration
7/31/2020 will reduce Adempas to daily again as no effect and has more cough and ? bloating
9/3/2020 orenitram 1 mg and 4 0.25 daily for now
will add 0.25 in the afternoon or increase to 0.25x2 in the afternoon
12/4/2020 will continue titration now at 2.5 mg daily
will add 0.25 mg (green) as tolerates up to 3mg total per day.

- SINGLE PULSE OXIMETRY MEASUREMENT (94760) ; Routine ()
- VISIT COMPLEXITY INHERENT TO EVALUATION AND MANAGEMENT ASSOCIATED WITH MEDICAL CARE SERVICES THAT SERVE AS THE CONTINUING FOCAL POINT FOR ALL NEEDED HEALTH CARE SERVICES AND/OR WITH MEDICAL CARE SERVICES THAT ARE PART OF ONGOING CARE(G2211) ; Routine ()
- Changed Tyvaso DPI 64 mcg cartridge with inhaler, 1 (one) cartridge with inhaler QID, 120 Each, 30 days starting 02/14/2025, Ref. Q 30 Days x1 Year, Mail Order 120 Each, 30 days, Ref. Q 30 Days x1 Year.
- How to Access Health Information Online using Patient Portal and 3rd Party Apps
- Plan: 10/14/21 Despite post Covid hospitalization clinically patient seems to have rebounded. Currently still on Orenitram OPSUMIT Adempas as ordered. Tolerating well. Will need updated PFT eventually will also need a CT chest.
due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs pt is at moderate risks for mortality and morbidity without close observation and monitoring. At risk for exacerbation and decline of lung function.
8/17/22 due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs
Will need updated echo also 6-minute walk patient is tolerating treatment no significant issues since last visit in October 2021.
Old records reviewed and summarized including
CXR
clinical notes from other HCP
labs
 12/20/2022 overall stable.  no increase cough congestions nor wheeze
1 adempas
1 opsumit
2 mg orenitram
due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs pt is at moderate risks for mortality and morbidity without close observation and monitoring. At risk for exacerbation and decline of lung function. stable on tx as ordered  will continue to monitor
stable on tx as ordered  will continue to monitor
Old records reviewed and summarized including
clinical notes from other HCP
labs

2/21/2023 Old records reviewed and summarized including
CT
clinical notes from other HCP
labs RVPS 47 12.22
Pulm pulmonary arterial hypertension perspective relatively stable
However has now severe dysphonia worse toward evening hours.  Does have acid reflux however has already been on omeprazole

will start antihistmaine and H2 blocker
salt water gurgle
contiue asme tx for PAH
4/25/2023 due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs stable on tx as ordered  will continue to monitor pt is at moderate risks for mortality and morbidity without close observation and monitoring. At risk for exacerbation and decline of lung function.

back on opsumit
stable on tx as ordered  will continue to monitor
will concit9e to mointor
9/27/2023 due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs
Has nausea in the morning suggest taking Orenitram with more "fatty" food
Switch Opsumit to nighttime
Due to some increasing dyspnea and fatigue by afternoon suggest adding Adempas at noon with food
Needs echocardiogram
Refill on Ventolin.

12/1/2023  due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs pt is at high risks for mortality and morbidity without close observation and monitoring.  At risk for exacerbation and decline of lung function. self adjusting meds at times will need updated echo

2/29/2024 2/24 RVSP 62
due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs
tolerating it
poressure iestimated is a bit higher
could not get opsumit too $$$$$
Adempas 1 (2mg)  daily
Orenitram 2 yellow daily (1 mg x2)
not able to tolerate Aes of orenitram so should consider tyvaso.

8/22/2024  Old records reviewed and summarized including
CT
clinical notes from other HCP
labs due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs pt is at high risks for mortality and morbidity without close observation and monitoring.  At risk for exacerbation and decline of lung function.
Tolerating Tyvaso feels much better will need 6-minute walk so echo will suggest to hold off on right heart cath for now.  Continue to titrate up on Tyvaso. Patient wants to titrate down Orenitram and Adempas due to adverse effect.

11/6/2024 Old records reviewed and summarized including
CT
clinical notes from other HCP
labs stable on tx as ordered  will continue to monitor pt is at moderate risks for mortality and morbidity without close observation and monitoring.  At risk for exacerbation and decline of lung function. due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs
Echo was done but result is still pending will request
Patient has self discontinue Adempas actually is feeling better
Tyvaso is a 48 but only twice a day
Orenitram 0.25 (green) for tablets daily
Suggest increase Tyvaso to least 3 times a day may try to wean off Orenitram given potential adverse effect patient has been experiencing
Patient is experiencing an ongoing new cough that is dry nonproductive will suggest trial of Spiriva this has been onset since weather change.  Also may be related to Tyvaso.  Will monitor.

2/14/2025 Old records reviewed and summarized including
CT
clinical notes from other HCP
labs due to high risk medication prescription, close monitoring of therapeutic and adverse effects are indicated via frequent labs, CTs, and PFTs pt is at moderate risks for mortality and morbidity without close observation and monitoring.  At risk for exacerbation and decline of lung function.
Subjectively tolerating Tyvaso and doing well.  Currently on 48 mcg
Most recent echo RVSP from November is 60 which is relatively stable
Symptomatically doing well able to do ADLs
However may require right elbow surgery
Likely will be done at Summerlin will standby for preop will await orthopedic evaluation.

- Study Results:
  12/2/10 RHC PAP 62/27, mPAP 38, CO 5.8, PCWP 10, PVR 4.8 woods unit
  6/15/11 6MW 390 meters.  95% sat.  HR 127  BORG 4
  7/26/11 6MW 312 meters.  92% sat.  HR 109 BORG 4
  11/29/11 6MW 420 meters.  93% sat.  HR 105, BORG 0
  2/25/13 FVC 1.16 (24), FEV1 1.03 (26).  The flow volume loop shows a severe ventilatory immpairment with reduction of expiratory volumes suggestive of restrictive disease.
  2/25/13 6MW 420 meters.  HR 78.  BORG 0

5/6/13 RHC PAP 61/29, mPAP 40, PCWP 13, PVR 4.8, CO 5.6.
7/5/13 6MW 460 meters.  HR 102, BORG 7
12/23/13 6MW 360 meters.  HR 86.  sat 95%
2/26/14 6MW 360 meters.  HR 99  sat 93%  BROG 8
4/9/14 6MW 370 meters.  sat 91%  BORG 7
9/30/14 RHC PAP 67/40, m PAP 42, CO 6.9, PCWP 15, PVR 426
1/22/2015 6MW 420 meters.  sat 94% HR 101.
5/20/2015 6MW 480 meters.  sat 95%  HR 100
12/4/2015 FVC 3.74 (77), FEV1 2.37 (62), DLCO 43%, DL/vA 66%.  The flow volume loop shows a moderate
ventilatory impairment with airways obstruction. Severe reduction in single breath diffusion capacity. Reduced
diffusion capacity to alveolar volume ratio (DL/VA).
4/28/2016 FVC 2.94 (61), FEV1 1.87 (49).  The flow volume loop shows a severe ventilatory impairment with
airways obstruction.
4/28/2016 6MW 340 meters.  91%  HR 108.
6/7/2017 6mw 480 METERS.  94%  HR 109
1/18 Echo RSP 40-45  grade I diastolic dysfx
6/4/2020 RVSP 50-55 from 5/28/2020 echo
dry ocugh
6/4/2020  need to tirate up on meds
7//2/2020 will try to increase orentrim
4 gree 1 yelloe
adempas and opsumit
10/15/2020 Clinically subjectively felt worse however discussed the patient I believe that his treatment is
underdosed and mainly secondary to patient's intolerance and adverse effect
We will suggest a repeat right heart cath at this point as her last RVSP was noted to be at 50-55 which is lower than
last years but higher than the year before
Suggest to continue to try to go up on Orenitram.  Will take to yellow which will be 2 mg
Increase 1-2 or even 3 grain which is 0.25 as much as tolerates
We will continue Adempas and OPSUMIT as is for now.
3/19/2021 RHC 1/29/21 PAP   PCWP 8,
PAP 59/24/37
PV% 4.0
CO 6.4
Clinically based on pulmonary hemodynamics PAH is under adequate control with use Adempas as well up some of
patient still has difficulty tolerating higher dose of treatment will continue Orenitram at 3 mg daily as is.
6/16/2021 contiue adempas 2.5 mg and opsumti daily
ok to try to lower Orenitram due to Aes
pt is at moderate risks for mortality and morbidity without close observation and monitoring.  At risk for
exacerbation and decline of lung function. due to high risk medication prescription, close monitoring of therapeutic
and adverse effects are indicated via frequent labs, CTs, and PFTs
9/15/2021 Old records reviewed and summarized including

clinical notes from other HCP
labs pt is at moderate risks for mortality and morbidity without close observation and monitoring.  At risk for
exacerbation and decline of lung function. stable on tx as ordered  will continue to monitor

12/29/23 RVSP 62

• Follow up in 3 months or as needed


Future Procedures:
   • 01/15/2024:  FLOW VOLUME LOOP (94375); Routine every 6 months ending after 2 times ()
   • 03/07/2024:  6 MINUTE WALK (94620); Routine every 4 months ending after 10 times ()
   • 12/01/2024:  2-D ECHOCARDIOGRAPHY WITH CONTRAST WITH M-MODE (93306); Routine every year for 7
     years (Dr. Sam Green to read)

**Gastroesophageal reflux disease (K21.9)**
**Problem Story:** has severe GERD now at night and is waking pt up with chest pain
hasbeen on Tums
suggested adding zantac OTC 2 tabs nightly
GERD may be aggrevated by adcirca
**Today's' Impression:** not able to tolerate PPI and zantac
but taking too many tums ? caused weight gain
doing better with carafate once daily is sufficient
4/15/2015 due to severe diarrhea will switch to H2 blocker for now
ok to take immodium
4/5/19 Exacerbated with medication secondary to Adempas and Orenitram. However is taking H2 antagonist.
4/24/2020 stable on tx as ordered will continue to monitor
9/3/2020 PPI BID for now to see if helps
10/15/2020 continue PPI BID for now

- Restarted omeprazole 20 mg capsule,delayed release, 1 (one) Capsule BID, #180, 90 days starting 02/14/2025, Ref. Q 90 Days x1 Year.

**Bronchitis (J40)**
- Restarted amoxicillin 875 mg-potassium clavulanate 125 mg tablet, 1 (one) Tablet BID, #20, 10 days starting 02/14/2025, No Refill.

Immunization Record

| Immunization Type | Immunization Order | Date | Medication | Funding | Comment |
|---|---|---|---|---|---|
| COVID-19, mRNA, LNP-S, PF, 100 mcg or 50 mcg dose | COVID-Moderna (100 MCG/0.5 ML) (91301) | 8/17/2022 9:11 AM | | | ** Not Given ** Declined by Patient/Guardian: |
| Influenza, inj, MDCK, preservative free, q.valent #2 | Influenza, inj, MDCK, preservative free, q.valent (90674) (FLUCELVAX) | 2023 | | | ** Not Given ** Declined by Patient/Guardian: |
| Influenza, quadrivalent, preservative free | Influenza, split virus, trivalent, PF (90656) | 2020 | | | ** Not Given ** Declined by Patient/Guardian: |
| Pneumococcal (2 years and up) | Pneumococcal (2 yrs and up) PPSV23 (90732) (Pneumovax 23) | 2/14/2025 | | | ** Not Given ** Declined by Patient/Guardian: |

George S. Tu, MD electronically signed  02/14/2025



9/16/2025

Timothy Thurtle

████████

To Whom It May Concern,

I am writing to provide medical justification for the necessity of performing echocardiograms twice annually for Timothy Turtle who has been diagnosed with pulmonary hypertension (PH).

These parameters are vital for risk stratification, guiding treatment decisions, and assessing the effectiveness of ongoing therapies. According to current guidelines and expert consensus, serial echocardiograms are recommended every 6 months for patients with established pulmonary hypertension to ensure timely intervention and to prevent irreversible cardiac damage. Mr. Thurtle last echocardiogram on October 9, 2024. See report.

Please feel free to contact our office at 702-360-7600 for any additional information or documentation.

Sincerely,

Cuong Nguyen, M.D.

# Alta Cardiology Clinic

10040 Alta Dr. Ste 350
Las Vegas,NV 89145
(702) 360-7600

| | | |
|---|---|---|
| **Patient:** THURTLE, TIMOTHY N | **Age/Sex/DOB:** 64 yrs  M | |
| LAS VEGAS, NV 89130 | **EMRN:** 80▮ | |
| | **OMRN:** 80▮ | |
| | **Home:** (702)▮ | |
| | **Work:** | |

## Results

| | | |
|---|---|---|
| Lab Accession #    TW1392110840 | Collected:   10/9/2024  12:00:00AM | |
| Ordering Provider:   NGUYEN, CUONG | Resulted:   10/10/2024  12:00:00AM | |
| Performing Location: | Verified By:   NGUYEN, CUONG | |
| | Auto Verify:   N | |

**PACS Echo 2D**                                                      Stage:       **Final**

N/A

| Test | Result | Units | Flag Reference Range |
|---|---|---|---|
| Echo 2D | | | |

```
                              Alta Cardiology
                         10040 Alta Drive, Suite 350
                            Las Vegas, NV 89145
                            Phone: 702-360-7600
                            Fax: 702-363-2250

              Transthoracic Echocardiography (TTE) Study
   Demographics
   Patient Name: THURTLE TIMOTHY N                       Patient ID:

   Date of Birth:                                        Visit #:
   76564920
   Age:              64 year(s)                          BMI:              26.6
   kg/m\S\2
   Gender:           Male                                BSA:              2.1
   m\S\2
   Height:           72 in.
   Weight:           196 lb.

   Procedure Information
   Procedure Type:                TTE procedure: Echo 2D.          Study Date:
   10/9/2024 4:10 PM
   Accession #:        TW1392110840                        Image Quality:
   Good visualization
```

9/16/25, 1:49 PM                                    Kendo UI Editor content

**Patient: THURTLE, TIMOTHY N**                          EMRN: ▮▮▮▮▮▮

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|
| Heart Rate: | 84 bpm | | |
| Blood Pressure: | 140 / 91 mmHg | | |
| Rhythm: | Sinus Rhythm | | |

Procedure Staff                                                    Indications
                                                                   Shortness of breath.
Interpreting physician: Nekdelawit Aschenaki, MD
Sonographer:          Dale LaLande, RCS                            Pulmonary
Hypertension

SUMMARY
Normal left ventricular size with no regional wall motion abnormalities.
Global left ventricular function is normal.
The left ventricular ejection fraction is 57 % by Simpson's Biplane.
The left ventricular wall thickness is mildly increased.
There is grade 1 diastolic dysfunction, with normal filling pressures.
Global longitudinal strain is normal at -17.1%.
There is moderate eccentric tricuspid valve regurgitation.
There is mild pulmonic regurgitation. RVSP 60 mmHg

Electronically signed by Nekdelawit Aschenaki, MD (Interpreting physician) on 10/10/2024 at 2:49
PM
FINDINGS
Left Ventricle:
Normal left ventricular size with no regional wall motion abnormalities.
Global left ventricular function is normal.
The left ventricular ejection fraction is 57 % by Simpson's Biplane.
The left ventricular wall thickness is mildly increased.
There is grade 1 diastolic dysfunction, with normal filling pressures.
Global longitudinal strain is normal at -17.1%.
Left Atrium:
The left atrium is normal in size.
The left atrial volume index is 24.66 ml/m\S\2.
Right Ventricle:
Right ventricle is normal size with normal wall thickness and function.
TAPSE: 1.96 cm
RV S': 0.107 m/s

Right Atrium:
Right atrium is normal in size.
Mitral Valve:
There is mild mitral sclerosis.
There is no mitral valve stenosis.
There is trace mitral regurgitation.
Aortic Valve:
Mild sclerotic aortic valve without stenosis.
The aortic valve is tricuspid.

Printed by: Innocent, Claudia  |  9/16/2025  1:48:00PM                          Page 2 of 5

9/16/25, 1:49 PM                                    Kendo UI Editor content

Patient:  **THURTLE, TIMOTHY N**                              EMRN: ▮▮▮▮▮▮

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|

There is no evidence of aortic regurgitation.
Tricuspid Valve:
The tricuspid valve is structurally normal.
No evidence of tricuspid stenosis.
There is moderate eccentric tricuspid valve regurgitation.
Pulmonary Valve:
The pulmonic valve is not well visualized.
There is no pulmonic valve stenosis.
There is mild pulmonic regurgitation.
Aorta / Great Vessels:
There is mild dilation of the aortic root.
Pericardium \T\ Pleura:
There is no evidence of pericardial effusion.
There is no evidence of pleural effusion.
Shunts:
There is no evidence of a shunt by color doppler.
Miscellaneous:
The IVC is within normal limits with good respiratory variation.

MEASUREMENTS
Left Ventricle
LVIDd:                    4.6 cm            FS:              26.4 %
Septum Diastolic:         1.18 cm ( 1.15 cm)   LVIDs:           3.4 cm
Posterior Wall Diastolic: 1.22 cm ( 1.15 cm)
LV Mass (ASE):            202 g
LV Mass (ASE) Index:      95.41 g/m\s\2

Left Ventricle Ejection Fraction - Teichholz
LVEDV (Teich):            94.94 ml          LVESV (Teich):    46 ml
LVEDVI (Teich):           44.95 ml/m\s\2       LVESVI (Teich):   21.07 ml/m\s\2
EF (Teichholz):           52 %

Left Ventricle Ejection Fraction - Simpson
LVEDV (A4C):              101 ml            LVEDVI (A4C):     47.69 ml/m\s\2
LVESV (A4C):              45 ml             LVESVI (A4C):     21.36 ml/m\s\2
LVEDV (A2C):              108 ml            LVEDVI (A2C):     51.01 ml/m\s\2
LVESV (A2C):              44 ml             LVESVI (A2C):     21 ml/m\s\2
EF (A4C):                 55 %              EF (A2C):         59 %
LVEDV (Biplane):          105.38 ml
LVESV (Biplane):          45 ml
EF (Biplane):             57 %

Left Ventricle Diastolic Function
E' Septal Velocity:       5.83 cm/s (> 6.9 cm/s)
E' Lateral Velocity:      12.95 cm/s
E/E' Septal:              14.92
E/E' Lateral:             6.72
E/E' Average:             10.82

Patient:  THURTLE, TIMOTHY N                          EMRN: ▮▮▮▮▮▮

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|

**Left Atrium**
LA Dimension (2D):      4 cm          LA Volume (BP):        52.1 ml
LA/Aorta (2D):          1.08          LA Volume (BP) Index:  24.66 ml/m\S\2
LA Volume (A4C):        50.2 ml       LA Volume (A2C) Index: 24.64 ml/m\S\2
LA Volume (A4C) Index:  23.78 ml/m\S\2

**Right Ventricle**
RV Diameter:            3.3 cm
Basal RV Diameter:      3.81 cm
TAPSE:                  1.96 cm
RV S' Velocity:         0.107 m/s
RVOT (PLAX):            3.2 cm

**Right Atrium**
RA Pressure:            3 mmHg         RA Volume (A4C):       49.9 ml
                                       RA Volume (A4C) Index: 23.61 ml/m\S\2

**Aorta**
Aortic Root (2D):  3.72 cm       Aortic Root (2D) Index:  1.8 cm/m\S\2
Ascending Ao (Prox):  2.78 cm    Ascending Ao (Prox) Index:      1.52 cm/m
Aortic Arch:       3.11 cm

**IVC**
                                 IVC Expiration:        1.95 cm

**Aortic Valve**
Peak Velocity:          1.3 m/s        Peak Gradient:         7 mmHg
Mean Velocity:          0.9 m/s        Mean Gradient:         4 mmHg
                                       AV VTI:                29.1 cm

**Mitral Valve**
Peak E-Wave:            87 cm/s        Peak A-Wave:           82.9 cm/s
                                       E/A Ratio:             1
                                       Peak Gradient:         3 mmHg
                                       Deceleration Time:     164 ms

**Tricuspid Valve**
TR Velocity:            3.8 m/s        TR Gradient:           56.9 mmHg
RA Pressure:            3 mmHg
Estimated RVSP:         59.86 mmHg ( 20 mmHg)

Patient: THURTLE, TIMOTHY N                          EMRN: ███████

| Test | Result | Units | Flag Reference Range |
|------|--------|-------|----------------------|
| Pulmonic Valve | | | |
| Estimated PASP: | 59.9 mmHg | | |
| N/A | | | |

3506240400                                         P.01/01

# TRANSACTION REPORT

SEP/16/2025/TUE 02:02 PM

FAX(TX)

| # | DATE | START T. | RECEIVER | CON.TIME | PAGE | TYPE/NOTE | | FILE |
|---|------|----------|----------|----------|------|-----------|---|------|
| 001 | SEP/16 | 02:01PM | 97027501376 | 0:00:39 | 1 | MEMORY    OK | G3 | 0085 |